Good morning, Your Honors. May it please the court, my name is Tom Woodbury. I'm here representing Appellants Native Ecosystem Council this morning. And Your Honors, in my limited time here today, I'd like to talk about what is not in dispute in this case, because we are, after all, asking for Genova review of summary judgment. And our case is premised entirely on the record, on what the forest plan requires, and on scientific fact that the Forest Service does not dispute. So since what is at issue here today is a wildlife management area, let us begin with a scientific premise that underpins all of our legal arguments. According to the Forest Service biologists in this case, Juniper Juniper woodlands provide a sharp contrast with adjacent grasslands, increasing available cover, vertical structure, and habitat interspersion, and hence the number of potential niches available for wildlife.   Higher bird densities and greater species richness occurred in Juniper stands when compared to grasslands. So, of course, the agency is entitled to deference for a scientific conclusion. So the question that we'd like to hear about is why the Johnny Crow Project, their decision to go forward with the Johnny Crow Project, was arbitrary and capricious. So what specific errors do you want to focus on? The fact that the Forest Service is – has, for years now, been basically eliminating forest and shrub habitat in favor of grasslands habitat in an area. But haven't they explained that? What was the reason they gave for – what was the reason the Forest Service gave for … To increase forage for elk. And are you saying that that's arbitrary or capricious because they can't do that? Because it's not a – it's not a big game management area, Your Honor. It's a wildlife management area. And all of their management in this area of the national forest system, and only in this area of the national forest system, is required to benefit wildlife. Generally, more specifically, required to benefit wildlife that prefers seclusion habitat. So they say that … Grasslands does not provide seclusion to wildlife. So this says that the Forest Service said that increasing forage for elk, mule, deer, and other species that have seclusion as a habitat requirement will further the goals of the forest plan, which is to benefit those species. And they also state that the amount of cover remaining is at 50%. So there isn't an issue with sufficient hiding cover. So why was that erroneous? I'm sorry, what was the question? The last … Why was it erroneous for the Forest Service to conclude that increasing forage for species that have seclusion as a habitat requirement benefits those species, and since the cover remains at 50% cover, it doesn't detract from their coverage needs, their hiding cover needs? – Well, there's two issues there. And I'll leave the hiding cover determination, the second issue, aside for a second. So the question is, you're correct that assuming that big game – that the limiting factor for big game is forage in the wildlife management area and not hiding cover – assuming, in other words, that there's plenty of – there's a sufficient hiding cover. – They need food, and they need the hiding cover. So I think we can reasonably conclude that the Forest Service was not erroneous in thinking they needed forage. So what is the error they made? – Well, the error they made is in excluding – in not doing any environmental analysis of the impacts on species that require seclusion for a habitat other than big game. – Isn't this covered by a categorical exclusion? – The Forest Service says it's covered by a categorical exclusion. – Well, what's your argument for why it's not? – I'm sorry? – What is your argument for why it's not covered by a categorical exclusion? – That we have no idea what impacts – we know there are adverse impacts of this management regime on species – wildlife species that favor seclusion as habitats, such as pine marten and northern goshawk. There's no dispute that those species are adversely impacted. We have no idea what the extent of that impact is because they have not complied with the Forest Plan's monitoring requirements. – Well, hold on. The question is whether they're entitled to a categorical exclusion. You're asserting that there's definitely adverse impacts. There may be. There may not be. The question is, does the agency in the first instance have to do an EA or an EIS, or whether they're covered by a categorical exclusion? And as I read it, they were covered by a categorical exclusion. But I think you need to – – Well, that's the issue. That's what the issue is. – Well, right. But what you explained – what's the language of the categorical exclusion? – That it must benefit wildlife. – No. I don't think – oh, is that – anything that benefits wildlife is under a categorical exclusion? – That's the categorical exclusion that they're taking advantage of is that it benefits wildlife. So, therefore, that doesn't require environmental safety. – And you're saying it doesn't benefit wildlife. – So, for instance, it is a matter of scientific fact in this case that removal of shrubs and conifers decreases habitat for some wildlife species. – So their exclusion – I think they're relying on E6 – says timber stand and or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than one mile of low-standard road construction. Is that correct? Is that the categorical exclusion? So it doesn't say benefits habitat. But as I understand, the categorical exclusion says the Forest Service, based on its experience, has determined that these sorts of activities do not have an adverse effect on the environment. And so they've already made the determination that activities that fall within the E6 exclusion don't have an impact on habitat or wildlife for the environment. That's adverse. So are you saying there are some extraordinary circumstances in this case? And if so, what are those extraordinary circumstances? – Yes. First of all, the categorical exclusion does not exclude – does not mean that they don't have to comply with the forest plan. And in this case, as a matter of record, they're not in compliance with the forest plan. – And so what are they not complying with in the forest plan? – Wildlife management standards for the wildlife management area because they have not monitored the impacts of 30 square miles of eliminating shrubs and conifers on wildlife species. – So the district court – – They haven't even – I'm sorry, Your Honor. – The district court said there was only one report missing from 2016. Is that what you're focusing on? One monitoring report from 2016? – I'm sorry. I didn't – – With respect to monitoring, the district court said there was constant and broad monitoring, and there was only one missing annual report in 2016, but said that lack of such reports of that report didn't indicate that the project itself was arbitrary and capricious. So why was that erroneous? – None of the annual reports, Your Honor, if you look in the record, unless you're going all the way back to 1982, none of the annual reports disclose the impacts of eliminating shrub and conifers on wildlife species of concern other than elk and mule deer. So there's a whole array of wildlife that they're required to manage for, not just big game. They don't even – Your Honor, they don't even disclose the impacts of 30 square miles of eliminating conifers and shrub habitat on management indicator species. – So they – – Management indicator species, like the pond marten. – They say they're not – excuse me. They say they're not affecting 30 square miles. They just have scattered treatment areas. Is that erroneous? – I'm sorry, Your Honor. Can you ask the question again? – The government says it is not covering 30 square miles. It just has scattered treatment areas here and there over that area. Is that erroneous? – There's 30 square miles total of treatments over a period of decades. So basically since the year 2000. They've treated over 30 square miles of habitat to remove shrubs and conifers. – So that wouldn't be pursuant to this project if you said it started in 2000. This project hasn't started yet. – So extraordinary circumstances requires them to consider the cumulative impacts of what they're doing. That's part of extraordinary circumstance analysis according to NEPA regulations. – Well, hold on. Cumulative impact is the increase from the action. – I see. But it is when added to other prior actions. – And there's never been any NEPA done on those prior actions. We didn't learn about those prior actions until this project. – Let me ask. It seems to me you've got some procedural aspects to your case and then there are substantive ones. And the procedural one, you said they didn't file an environmental impact statement. And that, of course, is an issue. So whether they're required to is in front of us. And you said that they didn't file certain reports and so forth. And I think your argument is, so therefore, we didn't have the information we needed. I understand those arguments. But as it relates to the substance of the decision made by the judge relative to summary judgment on the project itself, which I would call kind of the substantive decision, are you attacking that as being arbitrary and capricious? Or are you saying because of the procedure, failed to follow procedural rules to provide information that this, they should not be allowed to proceed? Which one is it? – Okay. I want to, in answering your question, I want to focus on one of the primary concerns in here, which is the lack of adequate hiding cover for big game in the project area. So all the way up for, this area is naturally lacking in hiding cover. And all the monitoring done under the forest plan up until this project showed dramatic noncompliance or dramatic shortages of hiding cover. But all of a sudden, also all of a sudden. – Let me stop you for a moment. Because I want to make sure I understand. So the district judge looked at all that information. And they presented information that they did a satellite view or some kind of view in 2011. And they determined that there have been drastic changes from 2005. And that trees were growing, the saplings were coming up. And that the coverage wasn't a problem. So that data was in front of the district judge. And with that data and other data, the district judge said they were not arbitrary and capricious. And that's why I ask you, are you saying that that decision by the district judge is arbitrary and capricious on the record before it? Or are you challenging it based on the fact that since they didn't provide information of the type that you think they should have provided, their decision should be reversed? – Yeah, and that's what I was getting to. So what we have is this dramatic magnitudes of order increase in hiding cover between 2005 and 2011. This issue has been before the court before. And so the Forest Service knows the public has great concerns about this. It has been sent back to the forest before to redo their hiding cover analysis because it was inadequate. So here the question logically is, wait a second. For 20 years in an area that's naturally deficient in hiding cover, all of a sudden there's magnitudes of order increase in hiding cover. How can that be? And there is no explanation in the record, okay? The explanation to the court, to the lower court, which it accepted, was there was a dramatic increase in understory vegetation. Okay, the 50% proxy for measuring hiding cover is canopy closure. The reason that there is a dramatic increase in understory vegetation is because of a beetle kill over thousands of acres that's opening up the canopy. The trees in the top story are dying and understory vegetation is coming up. But the proxy for measuring hiding cover is canopy closure, not understory vegetation. So that is not just arbitrary capricious, it's factually illogical. It's an illogical syllogism. It's not scientific. It's not lawful. It makes no sense. And it's offered in litigation, post hoc rationale, for a remarkable, phenomenal, almost miraculous sort of development in the record that was never discussed. How can the forest never explain to the public how all of a sudden an area that was between 1% and 20% hiding cover is over 35% hiding cover in a matter of six years, during a time when trees are dying? Part of the problem with your argument there is that it relies on prior actions. Now, I mean, you're trying to tie that in by saying, I guess, I'm trying to reconstruct your argument, is that because they didn't adequately address the status quo, therefore they couldn't make a proper decision over whether this cumulative impact would have been significant such that it didn't fall within a category. So these are two different issues. The issue with cumulative impacts and wildlife monitoring has to do with the impacts on management indicator species like the pine martin that favor seclusion in their habitat. The big game issue is the hiding cover issue. And that has to do, that's just an ongoing issue. But are you suggesting they needed to do an EA or an EIS because it's a big game? Yes. No, not on big game, but on hiding cover and wildlife analysis. We don't have an explanation for why all of a sudden there's adequate hiding cover in the elkhorns. An area naturally deficient in hiding cover that has never come close to meeting standards. So how can they go forward with continuing to eliminate, because we didn't know they were doing this before, but continuing to eliminate excellent hiding cover, which is, you know, colonization of the grasslands. But that rolls into the whole argument that we started with, I think, of, is it arbitrary or capricious? I understand that... No, there's no support in the record for it. Well, I don't know that that's true. And it's unlawful. I think that's a... Well, I think that's... I understand that's your client's view. But it does seem like there is adequate evidence in the record that they can... I mean, all they had to do was consider it. And they did consider it. They seemed to be very upfront in recognizing they were scaling back the hiding cover, but that was offset by the increase in vegetation. And I mean, the forest plan... When was the forest plan adopted that you're saying they didn't comply with? In 86. So, I mean, what... Is your position that they have to continue to comply with every aspect of that if there's changing circumstances? Unless they amend it. Unless they amend the forest plan. Where did they not comply with the... Is it... I think it was 82, if that's the one I'm thinking. What is it that they... What specific provision of the 82 forest plan are they not complying with? Well, the hiding cover standards are what we're talking about. But what do they say about the hiding cover standards? They say that there was an incredible, like, magnitudes of order increase in hiding cover. It wasn't an issue. They basically said it wasn't an issue anymore. So, therefore, a categorical exclusion. Whereas it's always been an issue. It's been an issue before this court. You might want to answer Judge Akuta. Sorry, Your Honor. They said that they're complying with the hiding cover requirements. And so your challenge is factually you don't believe them. Do I understand that correctly? No, we're saying it's implausible to say that you can explain a dramatic increase in hiding cover by a dramatic increase in understory vegetation. Because they're relying on the proxy of canopy closure to show compliance with the hiding cover standards that they've never complied with before. And understory vegetation is not canopy closure. The reason that there's understory vegetation increase is because canopy closure is decreasing. So they can't have it both ways. Do you want to save some time for Rachel? Yes, please. All right. Thank you, Your Honor. Good morning, Your Honors. And may it please the Court. Kaitlin Shugart-Schmidt on behalf of the Forest Service. I'm sorry to interrupt, Roy. But can you answer the last issue the counsel addressed about the vegetation issue can't be a surrogate for the canopy closure issue? The last thing he was addressing. Sure. So the Forest Plan lays out two possible metrics to use to evaluate and meet this hiding cover standard. One relates to essentially if you're staring down the forest and you see a tree and there's an elk behind it, is at least 90% of that elk covered by that tree at 200 feet. So it does make sense that if you are looking horizontally across the land, understory growth would contribute to hiding that elk. So in that sense, understory growth does contribute to providing hiding cover for elk. However, the metric that's being talked about in this case is a canopy coverage metric, which does deal with an aerial image taken of the area that says, you know, if there's sufficient canopy cover in an area, that likely translates to sufficient cover underneath those trees that would provide hiding cover for elk. But the argument that the Forest Service has made here, and that's well supported in the record, is that both there has been understory increase, but the Forest Service has also appropriately modeled and used that satellite data to accurately determine hiding cover over the past 20 years as best it can. And if it's all right, I'd like to address this hiding cover point using three different points. The first is to clarify that the Forest Service has not had a sort of long history of data about hiding cover that has now dramatically changed. What it's had is two data points. One is a 2005 satellite image upon which a model was based, this VMAP model, and it's had a 2011 satellite image that was analyzed with a 2014 model. So first of all, it's just two data points. So when you look at these 2008, 2009 reports, they're all relying on that first data point that the Forest Service had, which did show less hiding cover in these areas. However, that 2005 model explicitly incorporated the predicted outbreak of the mountain pine beetle and included those predictions for decrease in cover in that modeling activity. And that's reflected in the record, in the supplemental excerpts of record at page 1439, when it says that the, it's talking about the criteria for the wildlife models and says they're expected to compromise wildlife habitats as modeled. And on page 696, which is in the project background report, where it specifically says the images, impacts associated with the mountain pine beetle outbreak have been incorporated in the model based on the 2005 data. Now what the Forest Service has is an updated image, this 2011 satellite image that it got a little bit later than that. It built a new model or it updated its model to analyze that impacts, analyze that image and it accuracy tested that model. So in the record, there's a document at 1442 of the supplemental excerpts that goes over the 2014 model and says that it's exceptionally accurate. And how was it accuracy tested? It was a scientist, I believe with the Forest Service who reviewed the model and analyzed how its predictions about and classifications for an area were reflected in the actual satellite imagery. And the whole document is available in the record  So the Forest Service's responsibility is to comply with this 50% standard and its data, its most up-to-date data demonstrates that it complies with that standard. The 50% standard came from the 2014 model? No. The 50% standard is in the 1986 forest plan. It is in 1986, not 1982. Yeah. The most recent version that's still in effect is the 1986 forest plan. That's the standards that we're operating under now. And so the Forest Service point is that based on the two satellite data points and the 2014 test of that model accuracy, they've determined that the 1986 standard is still being complied with. Yes, although it's only been complied within two out of the three relevant herd units here, which is why there's no activity or treatment planned on the, I believe it's called the Devil's Fence herd unit, because that hiding coverage level is still below what's required in the standards. And so there's no activity taking place there. And in both of the other two units, the North and South Crow units, treatment will only take place so that hiding cover is not reduced below that 50% standard. And I just note that the forest plan standard doesn't say hiding cover should be maximized to the exclusion of all other habitat types. It says hiding cover must be maintained at no less than the standard. And whatever is the proper mix of habitats beyond that that will best benefit, particularly these species that require seclusion, is a judgment that the Forest Service is supposed to make. So one of the problems I'm having with this case is what is actually before us? Because there's been a lot of arguments thrown out there. And what are we reviewing? I mean, can we say, look, as long as the Forest Service is maintaining 50% cover, there's no challenge? Or your response seemed to indicate there's still a decision that has to be made. I mean, you theoretically could take it back to 50%, but it could cause harm to the wildlife. And is that any wildlife? Or what needs to be considered there? So I think with regards to NFMA, there is a substantive component to the statute, right? The Forest Service must comply with the standards established in the forest plan. And what plaintiff would have to show- But that's it. So even if it turned out that that was harmful to the animals, as long as you complied with the Forest Service plan, presumably there would have to be a separate challenge to the 1986 forest plan to say, well, wait a second. That's not actually... That's causing harm to the wildlife. Right. I mean, the forest plan does have a general proposition that this area must be managed to the benefit of wildlife. So if there was a decision by the Forest Service- Could you violate that provision separate from the 50% standard that's in there? I don't think so. And that's certainly not what's taking place here. And what the plaintiff has to- But is that what they're arguing? You got to help us, because I don't understand what they're arguing. It's a little bit of a grab bag of arguments. My understanding of it is that under NIFMA, plaintiff is essentially making a couple of challenges to whether or not this particular project complies with the forest plan standards. The most sort of straightforward one of those, I believe, is that this project does not comply with the hiding cover standard established in the forest plan. There are also these more generic or these more sort of generalistic challenges about whether or not ecosystem management is permitted underneath the forest plan or- By the way, is that even a- Is that a discreet agency action that's subject to- I guess it's subject to review for arbitrary or capriciousness in the context of this final agency action. Is that correct? Right. So what plaintiff would have to show is that something about the use of ecosystem management caused this particular project to be inconsistent with a standard of the forest plan, not a sort of wholesale challenge to the general way that the Forest Service chooses to go about selecting its projects in compliance with plan standards. And then plaintiff, similarly, seems to be making a general challenge regarding the either public participation or release of annual monitoring data on behalf of the forest by the Forest Service. But again, that doesn't show in any way that this particular project is not compliant with the requirements of the plan. Can they even challenge that? Or I guess they're not challenging the annual reports. They're saying the Forest Service didn't comply, didn't properly consider those plans, or those plans weren't, they didn't adequately reflect what was actually going on. I believe that that's the argument, that somehow this project must fail because it was not based on a sufficient consideration of monitoring that maybe wasn't done and at least wasn't released in a report with the words annual monitoring report. So the district court said that there wasn't anything in 2016 qualified as an annual progress report. How does that affect our analysis? I don't think that it does, and in large part because this report, the scoping letter was released in 2015. And so it's really based on monitoring data before that point in time and because the Forest Service has continued to monitor SUNS that time. And also, again, the challenge as to whether or not this project is compliant, not whether or not the Forest Service has hypothetically complied with a requirement to release an annual monitoring report titled with that name every year. There's also an NFMA argument that the project doesn't benefit species, which requires seclusion. And from oral argument, I take it that this is referring to species other than elk and mule deer, such as goshawks, I guess it is. Can you address that issue? Yes, so the aim of the wildlife unit is to benefit species that have seclusion as one of their characteristics. And this project does that by increasing forage and other important habitat for elk and species that require these other types of habitats. And this particular wildlife management unit is really unique in that it doesn't just involve these high mountain areas that the Forest Service often manages, but it also involves the foothills, right, this continuous swing of land. And so there's many different habitat types there that the Forest Service has to take into account and has to manage together. And so it has to balance providing healthy forage for an elk with providing grasslands specifically for ground nesting birds to use with heavy juniper or whitebark pine areas for other species. And so once it complies with the forest plan standard to meet this 50% hiding cover, the other decisions that it makes about how to properly benefit that wildlife should be left to its expert discretion. But could they violate the forest plan by, I mean, I understand what you're saying, left to your expert discretion, but the plaintiffs do seem to be arguing that the Forest Service has not properly considered the harm done to some of these non-large game animals. Is there any amount of harm that could be done to some of these other animals that would violate the forest plan? I think in the abstract, it's possible that if you decided to go out and eliminate every tree that had a nest of a particular type of bird, that would be problematic under the forest plan, but that's certainly not what's happening here. Well, I mean, it may not even be a violation of the forest plan. It might be a violation of other environmental laws, but I'm just trying to understand what their hook is in the forest plan, because they seem to have some very heartfelt complaints about how the Forest Service is managing it, but we're trying to fit this into a legal construct, and it's hard to know where that comes in. Can you talk about the categorical exclusion? Because, I mean, is that one of the ways that some of their arguments could come into play? If there was such harm to these other animals, could that invalidate reliance on the categorical exclusion? Yes, because if you had an instance where there was an extraordinary circumstance present, like the presence of an endangered species that would be negatively impacted by this project, then the project would no longer be properly subject to a categorical exclusion. But there's no endangered species that are at issue here? The Forest Service, and this is in the record, went through and evaluated the known endangered and threatened species that were in this area and determined that this project would not have a significant impact on them. So I understood their opposing counsel's argument that there were extraordinary circumstances because the government failed to consider the entire roadless expanse and the potential designation as wilderness. I think those were the two points they made that required something beyond a categorical exclusion. Can you address that? So the Forest Service explicitly considered the impact of this project on the inventoried roadless area and the continuous additional roadless areas around that, and that is reflected in the record. And they specifically went through and considered what the impact would be on things like the ability to do primitive recreation on the viewshed. And they generally determined that the impact would either be short-lived, for example, you'd very briefly see cut down trees in areas where trees had been selectively removed, but you would ultimately have a positive benefit to the wilderness characteristics of this area because it would increase the sort of natural or native condition of this ecosystem. But what's important is that the Forest Service explicitly went through and considered the impacts of this project on the inventoried roadless area, and that's reflected in the record. Let me ask you about categorical exclusions.  and I'm not saying that it's an issue in regard to whether there was a categorical exclusion that was warranted. You did a lot of work, it seems to me, underlying that to get to that conclusion. It seems that there may be strategic reasons why you didn't want to do an environmental impact statement, but how often does that happen? Is that, and this is a fairly complex, factual situation, complex analysis, yet there's no statement, why? Well, I think the important thing to note about a categorical exclusion is that it represents a category of actions that the Forest Service has determined generally don't have any significant effect on the environment. And so it's appropriate for the Forest Service, when it's doing these, I think the district court called it a minimalist in both impact and scope type of project, that they shouldn't be then responsible for doing an entire EIS if they already know going in that the project will not have significant effects because it's both subject to the categorical exclusion and there's no extraordinary circumstances present. And I think that's well-documented in the record. And I understand what the law is, but you see this as being a minimalist kind of project. And that's what the conclusion was. Now, let me ask this. I'm not suggesting that you were required to have one, but if you were required to have one and you didn't, that would cause us to reverse the judge completely here, right? If you thought that the categorical exclusion was not appropriate, then we'd probably ask that you remand to the district court to consider whether or not the project should be vacated while the service determines whether or not it would like to engage in more NEPA analysis or choose to move forward with a different project. And just one other question related to that. These reports that the appellant indicates were not filed, I know the district court found that most of the reports were filed and there was one year where it wasn't. How you analyze those reports? Do they have the same kind of significance as an environmental impact statement or less so? No, I think the annual monitoring report issue here really focuses on whether or not the forest service is complying with any obligations it might have to monitor and to use that data as part of its management activities in this area. And I think the record certainly demonstrates that the service has extensively monitored this area. It's considered the impacts on a wide variety of populations, animal populations and on vegetative species. And then it's used that data in shaping the choices it makes about management. I think that amount of monitoring data certainly underlies the service's decision to try to move forward with a project like this and to know that it's properly subject to a categorical exclusion because it's not going to have a significant effect because they have all of this data to underlie why this project is appropriate. If the court has no further questions, we'd ask you to affirm. Thank you. Thank you. Thank you. Can I have the rest of her time? So quickly, under NEPA, the forest service may not use a categorical exclusion absent certainty that the project will not cause significant effects to wildlife diversity associated with the habitats targeted here. As I mentioned before, it is not contested in this case that removal of shrubs and conifers decreases habitat for some wildlife species. We're not told which, there's no analysis of which, how much of that harm is. The problem with that argument, it seems, is you're basically arguing the categorical exclusion is just improper, not in these circumstances, but it's just wrong to begin with. You seem to be challenging it. When you do the extraordinary circumstance analysis and disclose that, oh, by the way, there's 30 square miles of treatments that we've done since 2000 that we have done no EAs or EISs on, right? And this is a continuation of the program we've been doing under this memorandum of agreement with Fish and Wildlife and so on and so forth. The public has a right to know what is the effect of that 30 square miles of removing trees and shrubs on wildlife that likes trees and shrubs? Because we happen to think most wildlife likes trees and shrubs better than grass. This is national forest land, not a national grassland. And so we're not saying necessarily that the Forest Service, what they're doing is absolutely wrong from a wildlife perspective. We don't know what the trade-offs are. We know there are trade-offs and this is the only area in the entire nation where they're required to manage exclusively to benefit wildlife species. And they're only benefiting elk and we think an EIS is required to tell us what the trade-offs are of the ongoing management. I think we have your argument. Thank you. We thank both sides for their argument. The case of Native Ecosystems Council, Montana Ecosystems Defense Council versus Leanne Martin is submitted and we're adjourned for this session. Thank you.
judges: Ikuta, R. Nelson, Oliver